Good morning, and may it please the Court. My name is Sarah Kobach. I'm appearing on behalf of the petitioner, PacifiCorp, and I'd like to reserve three minutes of my argument time for rebuttal, if I may. Thank you. Utility rates normally are adopted and implemented only on a prospective basis. This case is a very unusual situation. I think the rates were adopted on a prospective basis. The question is whether the billing was done on a prospective basis. Yes. They were not implemented on a prospective basis. So they were adopted. Well, they were and they weren't. They were implemented imperfectly. They made a mistake and you kept your mouth shut. No. Well, yes, you did. Or rather, your client did. No, Your Honor. The circumstance here is Bonneville had a rate it adopted back in 2002. It failed for more than a decade to implement this rate until 2015. Customers had no notice of this failure. Still, how could your client not have known that it was, in fact, redirecting the reservations repeatedly over that period? Thank you. So Bonneville actually acknowledges this very point in its agency decision document, the ADF. And what it acknowledges is that there was notice. Customers had notice of this rate. I'm sorry, what? Customers had notice of the rate. We don't dispute that point. But what we did not have notice of was that Bonneville had failed to implement the rate. Of course you had notice of that. You knew what the rate was and you knew what you were doing. The problem is, Your Honor, is that Bonneville allowed, because it failed to implement the rate, customers redirected reservations for years without record. Customers came back to Bonneville and said, hey, you know what, you've made a billing mistake. You didn't. The reason why we didn't is because we did not notice this error. And the failure to notice the error was reasonable. And Bonneville itself acknowledges that. On page 20 of the agency decision document, that's the internal document where Bonneville evaluated this issue. Is there anything in the record that suggests that there was some thing? I mean, you have to agree, I think, that your client knew or should have known that the practice was applicable to them, because they did redirect. Yes, in part, Your Honor. And that's... So then, so the only possible sort of innocence argument is that there was something so opaque about these bills that you couldn't figure out that they weren't charging you. Is that what your point? Well, yes, yes, and there's more to it than that. So what Bonneville recognized when it imposed this decision, the reason why customers did not have notice of this failure, is not only that it's not apparent on the bill, but also because it's not, it was not apparent that these redirect actions would trigger the rate. For example, partial redirect actions is a perfect example. Well, actually, the provision, at least at some point, became quite clear about that. The provision changed on that. And so customers were redirecting... Well, okay, as I just said, at some point, it became perfectly clear about that. It became perfectly clear when Bonneville imposed this retroactive rate penalty. No, it became perfectly clear well before that, as I understand it. I don't know if it ever said anything different, but at some point, you know, long ago, as I understand it... No, Your Honor... ...it became quite clear about partial redirects. No, Your Honor, we would disagree with that premise. Bonneville, because it failed to implement the rate, customers were, over the years, redirecting reservations without seeing any drop in their STD amounts. Now, if Bonneville had applied this rate correctly from the beginning and customers had seen those drops in their STD credits, customers would have investigated that issue and learned that these types of redirect actions triggered this provision, and they would have modified their practices. And Bonneville expressly recognized that. Could you be specific about what about the language was not clear? In terms of the partial redirects? So, if you look at page 16 of our opening brief, that's where the rate is quoted, and it provides there that if a customer requests secondary transmission changes that use the capacity that the STD will not apply. But it does not specify that the STD will not apply at all. So, for example, if a customer only redirects a small portion of a reservation, maybe for a single day, this does not state that the STD will be completely lost, and that's just one example of this issue. So, customers, they make complex decisions with their transmission, and the whole point of this rate was to impose a penalty on customers to discourage them from redirecting reservations. And the fundamental problem with Bonneville's argument or Bonneville's decision is it recognizes that customers likely would have modified their practices if they had notice of that. If they had seen a drop in their STD amounts, they would have changed their practices, and Bonneville never would be in the position to collect the revenues that it's now seeking to recover. So, tell me more of what's in the record with respect to what the changes would have been by a Bonneville customer in their redirect practices, why they would have made that, and so on. Help me understand the practical reality from your client standpoint. The practical reality is that when customers are setting their reservation schedules, they do it in a way to obviously reduce the cost as much as possible. So, if they receive these STD credits, there is nothing on the bill that shows the redirects. It's a single line item that shows what these are. As a practical matter, customers would have changed reservations to, for example, not partially redirect a reservation that they could have kept on that line when the dollar consequence would be significantly adverse. And, in fact, the one customer who received notice of this issue, Grant County, when they learned the actual impact of what this STD removal rate was, they immediately changed their practice. Now, it turned out that their efforts to do so were not successful, but it shows that customers certainly would have modified their practices, and certainly Bonneville itself recognized that. Help me understand what modification of the practice means. Does the customer have a contract with Bonneville for a certain amount of power, and they can say, well, I don't want to use all of that power because otherwise I would be redirecting it and it would cost me money? Help me understand this. Yes. So they schedule a reservation for transmission services, and then they have to make different decisions as they're going on how to adjust, I guess, to actual circumstances. So they make decisions about whether to redirect power in different ways. What they would have done, in fact, again, the customer who had notice tried to do, is change those practices so they wouldn't lose these credits. If Bonneville had correctly implemented its rate from the customers would have had that opportunity. And the fundamental problem with this type  They didn't have the opportunity because they knew about the policy. They didn't... They knew about the redirecting, and they knew about the policy. They knew about the policy in the abstract, on the books. You're essentially saying, as I understand it, that they would have assumed that they were being billed in accordance with the policy, not that they would have assumed that they were being billed in accordance with the policy, right? Customers reasonably assumed they were being billed. Right. And therefore, if they thought they had a problem, if they were trying to save money, they would still change their policy because they're losing money. Exactly. Customers were... But they would have to know. I mean, your assumption is they knew they were losing money, not they didn't know they were losing money. No, Your Honor. The problem is that, I'm not sure if I'm understanding your question, but the problem is that customers were scheduling reservations. They were not seeing... Because Bonneville had failed to implement this without notice, they weren't seeing drops in their SDVs. Oh, right. But your assumption is, has to be, not that they were billing incorrectly, but that they were billing correctly. They knew that this policy existed. Correct. And they knew... So your assumption must be that they thought Bonneville was billing correctly. Exactly. If they thought Bonneville was billing correctly, then they knew that if they wanted to save money, they should limit their redirects. And... And so why does the fact that they were actually billing incorrectly have any impact on whether they would limit their redirects? Because they were not seeing the drop in their SDVs. So they were taking... So therefore, i.e., they knew that they weren't applying the policy. No, no. No. No, I'm sorry, Your Honor. Let me be clear about this, because this is a very important point. Customers were making decisions about how to schedule their transmission based on the assumption and the understanding that Bonneville was correctly applying the policy. Therefore, if they want to save money, they should have fewer redirects. And... But the problem is that they were taking redirect actions that weren't triggering a loss. And so it was reasonable for them to assume that those types of actions didn't trigger the policy. Well, but I'm assuming that the redirect amounts vary from month to month or year to year. And yet the bill never changes. That's interesting. So you would suggest that... That would suggest to you that Bonneville is not actually billing for the redirects. No, the... I'm sorry, Your Honor. The bill certainly does change as it fluctuates up and down. Well, you know how much power you're using, so of course it goes up and down. Well, but also how the reservations are scheduled on short distances. And what... Let me back up for a minute. Okay. Suppose you're right about this. I'm not even sure right about what, because I'm not sure I understand your argument. But suppose there is some way in which customers were misled. Is that the end of the story? In terms of whether the decision was arbitrary and capricious or unreasonable for APA purposes? So there's a number of different reasons why it's arbitrary. What? There's a number of reasons why it's arbitrary and capricious. The first is that customers had no notice of the issue. And the second is that Bonneville itself had notice of the issue, and it failed to act. It received notice of this issue in June 2011 and June 2014. Well, it knew that there was a problem with respect to two customers. And when they got the second... I mean, their story, although I don't know that it's reported in the record, is that until they got the second notice, they didn't realize it was an overall problem as opposed to a company-specific problem. And the problem is that it's not supported in the record. The record contains no analysis about why Bonneville failed to act in 2011 and 2014. All the court is left with is post hoc rationalizations for that inaction. The ADF acknowledges that Bonneville had notice of the issue in 2011, and it does not explain why Bonneville failed to act. Bonneville now offers the court... Let me ask you to back up a little bit. This argument that you've been making, I think ever since you started, what does it go to? Does it go to the fact that the, say, the retroactive correction decision, I'll call it that, is arbitrary and capricious? Yes. Is that where it goes to? Yes. It goes to the fact that it's arbitrary and capricious for Bonneville... In other words, since there's nothing else they could have done at this stage, they should have discovered it earlier and taken corrective action earlier? Is that what you're saying? Because otherwise, as you were arguing, customers are prejudiced because they couldn't take any action to lessen the impact of the rate change? Exactly. That's your entire argument, isn't it? That's our point, is that when Bonneville discovered this error, they certainly have the right to apply it prospectively, but Bonneville had a duty to correct the issue when it had notice of the issue, and it failed to do so. This is fundamentally different than... Now, the record shows they had some notice, right? Correct. But they spent a lot of that time, too, investigating the problem, right, once they got the first notice?  The record contains nothing about that. Or the second notice from the same utility. No. The record contains nothing about that. What the record does show is that it's clearly in the existing administrative record. Now, we contend it's improper for Bonneville to attempt to change the record on review and to offer new documents outside of the record. If the court agrees with us on that, then the court does not need to address our cross-motion for discovery. We think on the face, the decision is arbitrary and capricious. If this court were to disagree... Back up for a minute. Does your argument fail if they're, in terms of the dialogue we were having earlier, that we've come not to agree with your basic equity argument, i.e., that you somehow were misled? Lost the opportunity. Right. I mean, is that essential to your argument? It is one component of our argument, certainly. We think that we have been, by retroactively applying the penalty, we've lost the opportunity. But it's not the only argument. Bonneville also has a duty to comply with its policies. It cannot adopt a rate and simply fail to implement it, to get notice of that, and fail to act. It's prejudicial to customers, and it's also arbitrary and capricious because it's contrary to its policies. And the record really contains no explanation for Bonneville's inactions. All the court is left with is these post hoc rationalizations. They're not supported by the existing record. And certainly, if the court is willing to consider those post hoc rationalizations and allow Bonneville to add new documents at this stage in the record, the right answer would be a remand for discovery on those issues and a complete supplementation of the record. And the document that we've added shows that Bonneville's post hoc rationalizations don't appear to be accurate. Let me ask you this, if I'm, I realize we're taking you over. Yeah, and I apologize. No, no, no. We're taking you over time, and you'll get a chance to respond. Thank you. I appreciate that. Don't worry about the time. Here's my question. As I look at the record here, the liability for your clients are roughly $8 million. Almost $9 million, correct. Assuming that you're correct, that had you known of the billing practices, you would have mitigated in some way, and your bill, what I'm now making up the number, would be $4 million. But you're not asking for that. You're asking to have the entire amount forgiven. How do you justify asking for the entire amount to be forgiven? We think in a circumstance where a federal agency has failed to follow its policies and failed to act, the proper answer is that it can apply this rate prospectively, but not retroactively. Now, but certainly, oh, go ahead. As a general matter, that's not the law, right? In other words, if IRS makes a mistake, it can come after you for the money. As a general matter, it is not the law. This is a fundamentally different situation, where Bonneville is, for the very first time, imposing a rate on a retroactive basis. I don't think the IRS could come up with a penalty. No, that's certainly not true. It is not imposing a rate on a retroactive basis, because the rate has been there all along. I'm sorry. It's implementing the rate on a retroactive basis. It never implemented it previously. But the general rule that the government can go and recruit money that it itself improperly didn't collect is an established rule. We would agree it's an established rule. Not always. Not always. Exactly. It cannot be arbitrary or capricious in a circumstance like this, where the government is essentially retroactively imposing a penalty. Now, I know the court may disagree on that point, but for customers in Pacific Coast situation that have taken actions with the understanding that those actions didn't trigger the penalty. At the end of its brief, which seems to be right, is that you're essentially arguing for a judicial, not a judicial estoppel, but an estoppel against the government. No, we are not arguing for estoppel against the government. We are arguing that the government cannot act in an arbitrary and capricious way. And to your point, Judge Fletcher, I'm sorry, I don't think I answered your question exactly directly, but potentially, if Bonneville, this were remanded, and Bonneville wanted to undertake an exercise of what would be an appropriate rejection, that would be one thing. But Bonneville has taken the position that it's 100%. Excuse me, can I interrupt? Did you ever ask Bonneville to say, wait a minute, it's unreasonable for you to charge this almost $9 million, why don't we settle for six? Did you engage in that kind of discussion with Bonneville? Other clients, other customers did. Did you? Yes. The parties did engage in settlement discussions. Bonneville, the final decision letter that was issued to us in October, took the position that Bonneville would not grant any reduction to us at all. Now, we later learned after we filed this action that Bonneville, in fact, took a totally different stance to another customer and did grant a discount. And there's no explanation why it was willing to engage with that customer in terms of settlement discussions and not us. But there was no... Well, there was an explanation, which is it was the customer that originally brought this to their attention. Yes, but... Or thought that... Or asked them to fix it or something like that. It was Grant County who was the customer who raised the issue in 2011. But the fundamental problem with that is there is no finding in this record that Pacificor was in any way culpable for not identifying this error. Bonneville itself never argued that. They never argued that we were sitting on our hands, that we knew that Bonneville was not implementing this rate, and we nevertheless, year after year after year, did these actions,  there is nothing in the record that would suggest that at all. Bonneville has never taken that position. Okay. Why don't we hear from the other side and... Thank you. And we'll give you time to respond. I appreciate it. Good morning, Your Honors, and may it please the Court. My name is Sarah Cutill for the Bonneville Power Administration, and with me at council table is Chris Gunn, also from the... With me at council table is Chris Gunn, also from the Bonneville Power Administration. We ask the Court today to dismiss the petition for lack of jurisdiction, and we also ask in the alternative to affirm the decision because it was a reasonable exercise of Bonneville's authority in this case. I'd like to start this morning with jurisdiction and then move on to the merits and the agency's decision... Jurisdiction is based on the notion that there was an earlier final judgment? There was. The final decision was announced on September 25th of 2015, and... A little press release? It was not a press release. It was issued on what's called the tech forum, and that's a communication system that Bonneville uses routinely to inform customers of final actions. For example, when Bonneville adopts a new business practice, such as the one at issue in this case, it releases that information on the tech forum. But didn't you invite the companies to come and discuss with you the implementation and the problem, and then they did, and then you wrote this much longer and much more explanatory letter? And it seems like a really tough argument. That's not quite the case. So the tech forum notice that announced this decision indicates to customers that if they have any questions, they can direct them to a particular individual, but it did not leave the issue open for reconsideration, nor did it request any customer comment. And that notice came out also after a couple of months, I believe, of discussions back and forth between Bonneville and Pacificorp, in which Bonneville provided all of the information that Pacificorp would need in order to recreate the charges. It's an opaque form of decision-making, where you... I mean, you had all these internal documents that demonstrated what your considerations were, but you never made them public. There's no requirement that the agency... Oh, fine. Okay, there's no requirement. But in terms of what the usual form of a final decision subject to the APA is, I mean, it seems to me that if you were standing on that alone, you wouldn't be in very good shape with regard to defending it, because you have no... Your explanations are so paltry at that point. It was perhaps a little curt, but it did cite specifically to the rate schedule and the business practice. And from the agency's position, it was just... No reasoning at all. It was correcting a billing error in order to conform to its existing rate schedule, and it's... It turns out there was more internal consideration than that, but that doesn't become known at all until this longer letter on October 25th. That's right. And under the Administrative Procedure Act and an informal adjudication, the agency is not required to provide the extent of its full reasoning in every document that it considered when it came to its conclusion. It merely needs to state the grounds for denial under 5 U.S.C. 555. And that's precisely what the agency did on September 25th of 2015. So and I also ask your honors to consider that notice from the perspective of all of Bonneville's transmission customers. So for those customers that don't receive this discount, that September 25th notice was the only notice that they received of this error, Bonneville's decision to correct it and the basis for that decision. And now... People essentially asked for reconsideration, and your letter was essentially a denial of reconsideration, and that would ordinarily be a final decision of itself. Another final decision. There's at least a second final decision. And in that case, then, the court's review would be limited to Bonneville's denial of reconsideration and would not extend to the underlying agency action to recoup the discounts in the first place. But I don't think that makes a whole lot of difference. But were it otherwise, customers could simply restart the 90-day clock under the Northwest Power Act simply by sending Bonneville a letter in order to elicit a response. That would make the 90-day period essentially a nullity, because... How long did they take to write that letter? They wrote that letter... They wrote... They wrote their letter on October 2nd. And Bonneville responded... It took about a week to write the letter, so they're not exactly guilty of this. Well, they actually initiated their dispute under Bonneville's tariff on September 17th of 2015. Then, Bonneville announced its decision to all customers on September 25th. Pacificorp then followed up with a letter on October 2nd asking Bonneville to continue to delay the billing of the actual recoupment amounts. On October 28th, Bonneville denied... I think you should get to the merits. Very well. There's no disputing in this case that Bonneville has the authority under its statutes and under... As a government agency and the inherent authority to recoup funds that it's owed under its rates schedule. No, I find it almost inconceivable that an entity like Bonneville, which has been in this business for a very long time, can't manage its billing any better than you did with respect to this. And we don't deny that Bonneville made an error in this case in automating its billing system. But I do want to point out that there is... We do not... I mean, this is such a weird non-record. Does the record give us any idea what actually... Even that that's true? Part of the problem here... The record as opposed to the briefs that says what happened? Well, part of the difficulty here is that Bonneville does not have billing data between the 2002 and 2008. And that's because we had switched automated billing systems. I'm asking a simpler question. In the record, I mean, in terms of documents, is there any indication of... You're telling us that what happened is there was a programming glitch, essentially. Is that even in the record? I believe it is. Yeah, so as the EDF explains, Bonneville did not have the necessary automation to identify and remove the SDD when the qualifying reservation is redacted. That's right. It was... What we... Okay. It wasn't the... We didn't have the automation. Now, as you can see from the invoices that are in the record, these invoices are very complex documents. This was an aspect of Bonneville's billing system that was not properly automated when it adopted the billing system that it has now, which went live in 2010. I mean, it sounds like Bonneville bills kind of like hospitals bill, which is not a compliment. I'm a little unfamiliar with the way that hospitals bill. Well, you're lucky. But what about, is there anything in the record, you say in your briefs, that the explanation for the delay from September 11th, from 2011 forward, is that you didn't realize that this was a generic problem. Is there anything in the record to support that? It's essentially that in the ADF, the agency, the staff explain that they received notice from Grant PUD in 2011 of two isolated errors on its billing, on its bill. And the ADF simply reports that at the time Bonneville made corrections to those errors. The ADF then just moves on to the 2014 information that we received from Southern California Edison. So there's nothing actually in the record to support the notion that you didn't realize at the time that this was a generic problem. Staff did not make the explicit statement that we did not realize at the time that this was a larger problem and that that grant bill was simply a symptom of a much larger automation error. That's correct. And so I think if you, however, read the ADF with the presumption of regularity to which the agency is entitled, that silence doesn't necessarily rise to a negative inference. There's some material in the record in terms of the back and forth between Grant County and BPA at the time, in 2011, which maybe that was added later, I don't know, but there's something in the record that seems to say that you're going to look into this and figure out what the problem was or something like that. I believe that the revenue analyst at the time reported back to Grant PUD that she had corrected the two invoices and that she would keep an eye on it. And then after that occurred in 2011, Grant PUD changed the way so that it was no longer redirecting its reservations, instead it started to resell them to other entities, which companies can do, customers can do that. And then those other entities would redirect the reservation. Well, the letter to or from Grant County Public Utilities in December 2015 says that Grant had discussions with BPA at this time regarding BPA systems and had strong reason to believe that BPA had addressed this issue in the BPA billing system. That's right. And that was Grant PUD's litigation position in the context of a dispute with Bonneville. In another Grant PUD letter, Grant, which is in the record, it's 19295, Grant expressly states that Bonneville discovered this error in 2015. So yes, it took the litigation position that's expressed in that particular letter, but there's another portion in which Grant notes that Bonneville discovered this error in 2015. Now, the argument from the other side that strikes me as its strongest argument is that they were misled to their detriment by your mistake. And while I'm not sure that that should lead to an elimination entirely of the aid, almost $9 million, it does seem to me rather, I'll use the word unfair in a non-legal sense, but it seems to me rather unfair that they should be held responsible for the entire bill when they say that had we known what the actual bill should have been, we would have done something different and we would not have incurred this entire bill. How do you respond to that? I have several responses to that. First of all, every time that Pacific Corp made its marketing decision, it did so with full knowledge of the rate schedule and the business practice, which is clear that Pacific Corp should lose the discount. I also want to make... Let me parse that statement. They knew the billing practice or policy in the abstract, but they're saying that they thought that you were billing properly, and therefore there was no incentive on them to change what they were doing. How do you respond to that? Is that not true? It's somewhat nonsensical, because if they were making their decisions to redirect, knowing that they would lose the discount, that means that they were assuming that they were losing the discount all along. So the fact that they weren't means that they received a windfall at the expense of all of Bonneville's other transmission customers. I don't care about that last part. I understand that. Any time somebody gets a windfall, it's at the expense of somebody else, I get that. But I'm not quite sure I'm understanding your answer yet. You're saying that they knew and they knew they were being billed improperly and they were taking advantage of that? Is that in the record? That's not in the record, and we don't know that, because this is an APA case and we don't have the benefit of discovery from Pacific Corp. You're making a should-have-known argument. They should have known. It's not even that they should have known. It's that they made their marketing decisions knowing what the rate schedule provided. And the fact that the bills did not reflect what the rate schedule provided doesn't change the fact that when they made those marketing decisions, they did so with knowledge that they should lose the discount. We don't know anything in this record, do we, about the actual, what the bills look like? We do have the bills in the record. In terms of what you could actually understand from them? So the bills are in the record. They're about 80 pages apiece. There's, I think, 3,000 pages, I believe, of bills. And they're a little technical, they're a little difficult to see. But what the bills do is there is a report in each one that documents the short-distance discount that Pacificorp received. What it does not do is reflect their actual redirect decisions, but that information is available to Pacificorp. Not any impact on the redirect decisions? Well, so what it would do is in months, on a proper invoice, in months when Pacificorp redirected, it would see a reduction in the line items for its short-distance discount. And that's exactly what Grant PUD saw when it raised the issue in 2011, and it's also what Southern California Edison saw when it raised the issue in 2014. What would they have seen? What did they see? They would see a reduction in the dollar amount of their short-distance discount. They didn't see that, right, but they would have seen that had it been done, but it wasn't done. That's right. So, therefore, there's no line on there that, other than the fact that it isn't there. It's simply the absence of any line with regard to the redirect. There would still be a line, but customers' actual transactions are not printed on the bills, but that information is all obviously available to customers. It's their own marketing decisions that impact this. Right, but the only thing that is on the bill is this, the amount of the short-distance discount. I believe it's delineated also by the individual reservations that customers have. So, Pacificorp gets the discount on several different reservations, and I believe those are listed. So, when they read... So, if they knew that they had redirected that reservation, then they should have known that that was wrong. That's right. Okay. One... I have another question. I gathered that internally, which nobody knew at the time, but now that we see the record, there was a very close vote as to whether to recoup all the money or recoup or do it on a case by... Do it after negotiations with individuals. I mean, it's a little unusual that... I don't know whether this is a majority vote or whether there's somebody who gets to call the shot ultimately or what, but at any event, in terms of the staff, it was really close. Right? So, that seems to lead to the question of why it wasn't an arbitrary and capricious, close to what Judge Fletcher was asking, not to go to the individual people and try to find out whether they really were impacted and to what degree. The agency's decision was instead of... So, there was an option in the ADF, and that option was to essentially engage in a group negotiation in order to arrive at a negotiated number. What was the vote? It was like a one-person difference or something? Yeah, I forget. Ultimately, it's the chief operating officer who makes the decision because of the dollar amount that's involved. But within the staff, it was really close. That's right. But that does not render this arbitrary and capricious because at the end of the day, the agency has the authority to recoup the discounts according to its rate schedule. What was the explanation for why they did this? I'm sorry? What was the explanation for rejecting that option? I don't know that they articulated a reason for rejecting that option. Instead, what they felt was that it was more important to maintain the integrity of the rate schedule under the rate, on the duly adopted rate schedule, as well as to comply with the agency's existing and stated clear business practice that I think Your Honor was referring to earlier when you were asking what was... Did the articulation change at some point, or was it always the same? There was a business practice change in 2005, and at that time, the business practice was all or a portion is redirected for any time during a month, the discount will not be applied that month. It was clarifying? It was clarifying. At least, if anybody was confused from 2002 to 2005, by 2005, there was really no basis for a... That's exactly correct. And how far back, excuse me, and how far back does this billing go in this case, remind me? Well, in this case, we had information going back to 2010. We went 2010 to 2015. The agency doesn't have the ability to pull any bills from 2002 to 2015. So the assessed billing here runs from 2010? That's right, 2010 to 2015. We get the clarification in 2005, we get the billing running from 2010? That's right. And I also want to add quickly that the removal of a discount does not equate to a penalty. When the discount is removed, it just means that customers pay the at-cost transmission rate. Well, you can call it what you want, plus more money. It's loss of a discount. That's right. But the other problem, of course, with regard, from the perspective of the companies, is that they billed their customers based on what their costs were, and this wasn't figured in. So we essentially have an uncovered cost going forward. I assume they're going to be faced with the question whether they can now add that in. That was something that Bonneville considered when it made its decision, but there is no indication from Pacificorp. It did not provide us with any evidence to indicate that it was actually harmed in this regard. But given the size of Pacificorp and the scope of its operations, $8.7 million over five years wouldn't necessarily have an impact on its rates. But since you're taking a rigid position, rather than the negotiating position, that was the alternative, it wouldn't make any difference. Well, as part of the decision, Bonneville expected that customers could dispute the decision under the tariff. Under the tariff, but not dispute the tariff or the recoupment? If they wanted to dispute the recoupment, they had 30 days under the tariff in order to proceed with the dispute resolution process. In that process, customers could have provided Bonneville with additional information to factor. Again, your jurisdictional argument by saying there was no give, that you made a final decision. And that's correct, but if Pacificorp had presented us with evidence that we felt needed to be reconsidered, we could have reopened that decision and reconsidered it at that time. But they didn't provide us with any evidence. All they did was allege general error in the agency's decision and suggested that we don't have the authority to make this decision. Review for me if you will, when was the policy about redirect first announced and when did Bonneville start making its mistake with respect to billing? Well, we know that the rate schedule changed in 2002. The business practice then was updated in 2005. The actual error that we're here to talk about today is part of the automated system that was rolled out in 2010. We don't actually know what was occurring between 2002 and 2008. Meaning there may have been misbilling starting in 2002, but there may not have been? Exactly. We just don't know. We don't know. We don't know and Pacificorp doesn't. Do we know if there was misbilling starting in 2008 when the new system, the billing system was implemented? There were actually two correct applications of the short distance discount in 2008 and then there were a number of incorrect applications. But I thought you don't have bills before 2010? We were unable to correct bills from 2010 going forward, but there was a period of time in which the billing system was changing over. So I believe that in the root cause analysis that Pacificorp provided to the court, they were able to look at 2008 and there's some spotty evidence that... Where's that in the record? That's not in the record. That's in the document that Pacificorp provided to the court. And I'm trying to figure out, and it may be impossible to figure out from the record we have in front of us, whether in the period before 2010, the billing you've got is 2010 forward. I'm trying to figure out from the period before 2010 whether Pacificorp was getting a break for which recovery has not been sought. Is there anything in the record that will help us understand that? Unfortunately, we don't know. We do know that prior to 2009, Bonneville had a policy in place that was referred to as sheltering, and that was a manual adjustment to invoices that essentially mimicked a redirect without being a redirect. We know that revenue analysts at Bonneville, when they did this sheltering to a reservation that had the discount on it, they did remove the discount. So it wasn't a redirect. It was a little bit different. We were manually applying the provision, but that is something that is reflected in a 2006 email that we added as extra record materials. Thank you. Let's... Thank you. Would you put two minutes on the clock, please? Thank you, Your Honor. Unless the court has questions about jurisdiction, I don't plan to address jurisdiction. First, I'd like to start with the post hoc rationalizations that Bonneville has offered for its inaction in 2011, 2014, and for its explanation of why this error happened in the first place. None of those explanations are in the record. The explanation that this was a glitch suggests that Bonneville tried to implement this rate and it failed to. There's nothing in the record that suggests that. The ADF itself recognizes that Bonneville failed to implement this rate. The explanation that Bonneville failed to act in 2011, that is also not in the ADF. It is nowhere in the record why Bonneville failed to act. Now, Bonneville has claimed that the reason why it didn't act was that it reasonably understood that this was a one-off situation. Reasonably understood suggests that Bonneville investigated this issue and made a determination that it was just affecting one customer. Again, the ADF does not even explore this issue. It simply acknowledges that Bonneville failed to act after getting the notice. And what we know now is that Bonneville, in fact, did not investigate the issue at the time that it imposed this final decision. I have a question, which is, as you probably know, I was involved in the industrial I.C. New cases. The last one of those was, or maybe the next to last one of those, was about something similar to this. Mm-hmm. What they call the look-back. Yes. But that went through a whole administrative procedure. Yes. With hearings and participation and so on. What is there about the statute that permitted this to happen? I mean, you're not arguing that the procedures here were invalid, but why the difference? Do you have any notion? I think a fundamental problem that we have with Bonneville's decision is that it failed to engage in any kind of administrative process with customers. I mean, in fact, in this case, it's claiming that it made a final decision before customers even had a chance to respond at all. And, in fact, Bonneville was not quite that unreasonable. It did allow us to request information, but engage in no formal administrative process. And, in fact, when it imposed the final decision, it did not disclose many of the facts that we know today. We didn't know. That's not your argument. You're not making a new process. But the point is that it's difficult when an agency engages in no administrative process and is not transparent about the circumstances leading to its decision. It makes it very difficult for customers to respond and evaluate that decision. There's nothing in the statute that you know about that would have required them to go through a formal notice-and-comment process. They were not required to, but in that situation... Unlike the other case. Unlike the other case. I'm not sure if it was required in the other case, actually, because I don't believe that that was considered a formal rate-making procedure, but I honestly am not sure if it was required or not. I don't believe so. Do you have a case that supports your position that, what, failure to act in itself could make a decision arbitrary and capricious? What's your best case on that? I think the best case on that is a case that we cite in our brief from the Federal Circuit, the Mid-Continental case. And it's not exactly the same circumstances, but it's analogous. It's a situation where an agency adopted a rule that required customers to file certain reports. Customers did not appreciate that. They didn't file the report, and the agency tried to impose a retroactive penalty. The court in that case said it's arbitrary and capricious, or actually remanded for the agency to consider, whether it was fair in those circumstances, given the lack of notice to customers. And we think that case is fairly analogous to this one. This was a case where Bonneville – the question of whether – where it is in the record that customers lacked notice is ER20, where Bonneville itself recognized that customers over the years may have continued their redirected practices since Bonneville did not exclude the SCD in these circumstances. So Bonneville, in fact, at the time of its decision, expressly recognized the point that we are making. And it nevertheless acted without failing to consider – I'm sorry, without considering that point and the impact of it on its decision. Now, would the remedy then be just to – just to, you know, reverse that decision to retroactively collect the bills, or would it be okay to send it back for a more comprehensive review of, say, you know, giving some reasons for the delay? Yes. Yes, I think that those are the options before the court. The court could completely set aside the decision, but certainly the court could also remand to Bonneville to explain why its decision is not arbitrary and capricious in view of all these different circumstances, including the lack of notice to customers and Bonneville's failure to act over the years. So certainly a remand would be appropriate. And we certainly would urge that to the extent that this court is willing to allow or to entertain post hoc rationalizations, that the right answer in those circumstances, to the extent that the record is not adequate to explain these issues, that the right answer there would be a remand to the agency for further investigation, an ability for Pacific Corps to engage with Bonneville, and reconsideration of the decision. Okay. Thank you. Thank you. Thank both sides for your helpful arguments. Pacific Corps versus Department of Energy Bonneville Power Administration.
judges: Tashima, W. Fletcher, Berzon